IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS J. ALSTON,

    Plaintiff,

v.

TRUIST BANK,

    Defendant.

Civil Action No: TDC-22-2974

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Nearly 20 years ago the United Stats District Court for the Eastern District of Virginia entered a jury verdict against Truist Bank for failing to report the dispute status of an account. The jury found Truist Bank's failure to report the dispute status to be a willful violation of the FCRA and awarded punitive damages at an 80 to 1 ratio. After Truist Bank appealed the verdict, the Fourth Circuit found the following facts sufficient to sustain the jury's willful finding: "(1) [Truist's] records reflected the ongoing dispute over the debt, (2) [Truist's] reports to the CRAs did not reflect that ongoing dispute, and (3) [Truist] intended not to report that ongoing dispute." Saunders v. Branch Banking And Tr. Co. Of VA, 526 F.3d 142, 151 (4th Cir. 2008).

Incredibly, Truist Bank readily and proudly admits that it has <u>not</u> changed its policies over this nearly twenty-year period of time. [Deposition]. Notably, during this twenty-year period of time, at least two other circuit courts (i.e. Ninth and Third Circuits), followed Saunders and found that the failure to report the dispute status of a disputed account is not only a violation of section 1681s-2(b)(1), but a willful one. Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1164 (9th Cir. 2009); Seamans v. Temple Univ., 744 F.3d 853, 868 (3d Cir. 2014) (a blanket policy of never reporting an account as in a disputed status may support a finding of willfulness)

1

The <u>Saunders'</u> opinion is not only the seminal case on a furnisher's obligation under the FCRA to report a disputed debt as disputed, but it constitutes precedence in the Fourth Circuit. Significantly, a year before the Fourth Circuit's opinion in <u>Saunder</u> and seven years before the Third Circuit's opinion in <u>Seamans</u>, the Supreme Court issued the <u>Safeco</u> opinion—which specifically instructed FCRA defendants to heed the advice of the circuit court's holdings when interpreting their statutory duties under the FCRA. <u>Safeco Ins. Co. of America v. Burr</u>, 551 U.S. 47, 70 (2007) ("the benefit of guidance from the courts of appeals or the [FTC]" will determine whether a FCRA defendant's actions "reading [of the statute] was not objectively unreasonable")

Unbelievably, undeterred by three circuit court opinions instructing furnishers to report disputed debts as disputed, and the Supreme Court's admonishment to follow the guidance of the circuit courts, Truist Bank is STILL implementing a policy to ***NEVER*** report a debt as disputed. And what is the Defendant's basis for such irrational behavior? Metro 2 or the CRRG.[1] Rather that following the Supreme Court's instruction to heed the guidance of the circuit courts, Truist Bank relies exclusively on the Consumer Data Industry Association (CDIA), which is widely considered to be the "voice of the consumer reporting industry."

As if they needed to know, federal district courts have warned furnishers, such as Truist Bank, that following industry guidelines is not a defense that will shield them from liability under the FCRA, including a finding of willfulness. [Cite Cases] Nonetheless, Truist bank steadfastly holds to its blanket policy of never marking an account as disputed on the grounds that the CDIA says so. As bad as that sounds, it's worse than that. Contrary to Truist Bank's claim, it is not completely in line with the CDIA. The Metro 2 Manual actually contemplates a scenario where an

---

[1] The CDIA is the trade association for the CRAs, and it publishes a consumer reporting manual called the Credit Reporting Resource Guide—better known as the METRO 2 Manual. CRAs and furnishers alike rely on the METRO 2 Manual for their compliance with the FCRA.

account can be marked as disputed. Specifically, the Metro 2 Manual advises furnishers to mark an account as disputed when a consumer disputes the account directly with the furnisher. Truist Bank on the other hand, has a policy to *always* ensure that the account is not marked as disputed, even after receiving a direct dispute. Here, because the Plaintiff submitted several direct disputes in addition to his multitude of indirect disputes (via the CRAs), Truist Bank would have marked Plaintiff's accounts as disputed if it actually followed the Metro 2 Manual.

As if that were not enough, there's more. Recently, Sheffield Financial, a division of Truist Bank, was found to have willfully violated section 1681s-2(b) of the FCRA for failing to report a disputed debt as disputed *at the summary judgment stage*. Sherman v. Sheffield Fin., LLC, 627 F.Supp.3d 1000 (D. Min. 2022). During the discovery phase of the case, it was revealed that Sheffield Financial had implemented Truist Bank's blanket policy to never report a disputed debt as disputed. So, there can be no doubt that Truist Bank's decision to not report Mr. Alston's accounts as in a disputed status was willful.

## ARGUMENT

I.      **Plaintiff Is Entitled To Partial Summary Judgment On Four Issues.**

    A.      **Truist's report that Mr. Alston was 30 days late on his SunTrust account was inaccurate.**

It is undisputed that Plaintiff mailed the check for his May 2022 payment on May 13, 2022, see ECF 98-1 at ¶ 51, [96-1] Plaintiff's Ex. 1 (Truist 000054) and 3). More particularly, it is undisputed that the envelope for the check was postmarked for May 13, 2022, and correctly addressed to Truist, see ECF 98-1 at ¶ 51. "These two concrete facts, the postmarked date and the correctly addressed envelope, give rise to a rebuttable presumption of ***timely delivery***." Casto v. Branch Banking & Tr. Co., 2018 WL 265586, at *5 (S.D.W. Va. Jan. 2, 2018) (emphasis supplied). Nonetheless, Truist's argues that Plaintiff "has no evidence of when the Postal Service delivered

3

the payment to Truist or when Truist received the payment." ECF 108 at 10 citing ECF No. 83-3 at 4 (lines 87:14-88:5).  Contrary to Truist's claim, "under the traditional common law mailbox rule, a correctly addressed letter placed into the mailing system is **presumed to arrive at its delivery point** *in the usual time*." Casto, 2018 WL 265586, a *5 citing Philadelphia Marine Trade Association International Longshoremen's Ass'n Pension Fund v. C.I.R., 523 F.3d 146, 147 (3d Cir. 2008); also see Maggio v. Wisconsin Avenue Psychiatric Center, Inc., 987 F.Supp.2d 38, 41 (D.D.C. 2013) ("The rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed.") (quoting Hagner v. United States, 285 U.S. 427, 430 (1932).

The usual time for the post office to deliver mail is "three business days" Craul v. Wal-Mart Stores East, LP, 2012 WL 6823181, *5 n. 6 (M.D. Pa. Nov. 29, 2012) (quoting Phila Marine Trade Ass'n, 523 F.3d at 147); Barger v. Plant, 2015 WL 1926217, *1 (C.D. Cal. Apr. 27, 2015) ("U.S. Postal Service regulations express a general expectation that first-class mail will typically arrive at its destination within the United States within three mailing days. . . ."); and see U.S. Postal Service, First Class Mail, available at: https://www.usps.com/ship/first-class-mail.htm. Even in the best case scenario for Truist, the payment "arrived as late as two weeks after it was mailed." McCray v. Bank of Am., 2017 WL 1315509, *10 & n. 13 (D. Md. Apr. 10, 2017).

As our courts have repeatedly explained, where – like here – the moving party has produced admissible evidence, the opposing party must provide not merely a "scintilla" of evidence Brocious v. United States Steel Corp., 429 F. Supp. 3d 82 (D. Md. 2019) (citing Casey v. Geek Squad, 823 F. Supp. 2d 334, 349 (D. Md. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)). Here, Defendant argues that "the only evidence of Truist's receipt of the payment is the July 8 posting date reflected on both Alston's statement and the check itself." ECF 108 at

4

10. It goes without saying that the "posting date" is evidence of when Truist *posted the check*, not evidence of when Truist received the check. Indeed, Truist has admitted that it has absolutely no idea when Truist received the check. ECF 96 citing Busic Dep. 85:17-20; 86:1-3. Thus, Truist has presented absolutely no evidence, much less *admissible* evidence of when Truist received the check. "Because Plaintiff has demonstrated (1) proper addressing and (2) placement into the USPS system on [May 13, 2022], the Court [must] find[] that Plaintiff has entitled himself to the presumption of timely delivery." Casto, 2018 WL 265586, at *5.[2]

> **B.** **Truist's report that Mr. Alston was 30 days late on his BB&T account was inaccurate, incomplete or misleading.**

It is undisputed that on December 18, 2021, the Plaintiff initiated a payment for $27 on Truist's website, see ECF 98-1 at ¶4. Although Truist speculates that the failure of the payment to be processed was the fault of Plaintiff or his bank, see ECF 108 at 8 ("to the extent there was any error, it appears to have been in Alston's own authorization of the payment or his bank's failure to execute such payment."), Truist has presented no such evidence, let alone admissible evidence. Likewise, Truist has presented no evidence that it did not mishandle the processing of Plaintiff's payment on December 18, 2021.

In light of the fact that Plaintiff did not act financially irresponsible with respect to his December 2021 payment—he did his part in making his payment by initiating the payment on

---

[2] Furthermore, even if the postal service did not deliver the check to Truist until July 8, 2022, the Plaintiff would not have been at fault for the untimely delivery. Therefore, Truist reporting Plaintiff as 30-days late on his May 2022 payment does not accurately portray Plaintiff's financial responsibility. The Fourth Circuit has held that in such circumstances, the reporting is incomplete and misleading. Saunders. In addition to reporting the debt as disputed, courts have held that the furnisher should report the specific reasons for the non-payment. Gunn v. JPMorgan Chase Bank. Whether the omission of the information "suggests that [Mr. Alston] is a riskier debtor than may be the case if the mitigating information—[mailed the letter 5 days before the due date but either the post office did not deliver the payment or Truist failed to credit the payment until 60 days later—]had been disclosed." Gunn v. JPMorgan Chase Bank, N.A., 2024 WL 4451609, *7 (D. Md. Oct. 9, 2024)

5

Truist's website on December 18, 2021, which was within 30 days of the December 5th due date—the Defendant was required to report Plaintiff's dispute, <u>Saunders</u>, and mitigating facts.[3]

### 1. Truist's reliance on Braun v. Trans Union LLC, 2019 WL 13083348 (C.D. Cal. Oct. 10, 2019) is misplaced.

Relying on <u>Braun</u>, Truist argues that it did not have to "provide additional information to explain the significance of an otherwise accurate report entry" because the omitted information "is not the type of misleading omission that is sufficient to fulfill the inaccuracy element of a [FCRA] claim." ECF 108 at 9 citing <u>Braun</u>, 2019 WL 13083348 at *2. Truist's reliance on <u>Braun</u> is misplaced. The facts in <u>Braun</u> are not identical to the facts in the case at bar.

In <u>Braun</u>, the plaintiff **forgot** to make her payment. Specifically, she originally set up automatic payments for her original lease, but "failed to realize that the automatic payments" stopped after she entered into an extended lease and her original lease ended. <u>See id</u>. Importantly, while the Braun "dispute[d] that the lateness was not her fault," <u>id</u>. citing <u>Braun</u> at *3, she did not allege that she tried to make her payment and that the defendant failed to process the payment. Significantly, in cases where the Plaintiff attempted to make his or her payment, but the payment was not processed or accepted due to no fault of the plaintiff, the defendant's reporting was inaccurate or misleading if the defendant omitted the reason for the nonpayment. <u>See e.g.</u>,[4]

---

[3] Truist also argues that Plaintiff's dispute constitutes a legal dispute that cannot give rise to liability under the FCRA. ECF 108 at 8-9 citing <u>Hunt v. JPMorgan Chase Bank</u>, 770 F. App'x 452, 458 (11th Cir. 2019). This argument has no merit for several reasons. First, in the Fourth Circuit, a legal dispute is not a concern for a furnisher. <u>Saunders</u>. Indeed, while Truist cites to an unpublished Eleventh Circuit opinion from 2019, the Eleventh Circuit published an opinion in 2024 that rejected legal dispute doctrine and adopted the approach of the Second Circuit, which focuses on whether the challenged information is "objectively and readily verifiable." <u>Holden v. Holiday Inn Club Vacations, Inc.</u>, 98 F.4th 1359, 1368 (11th Cir. 2024) (citing <u>Sessa v. Trans Union, LLC</u>, 74 F.4th 38, 40 (2d Cir. 2023) ("[A]n FCRA claim alleges an 'inaccuracy' so long as the challenged information is objectively and readily verifiable.")). Second, a dispute about failure to report a payment is a factual dispute, not a legal dispute. Abukd"Plaintiff ha[s] not presented a legal defense to the late reporting. [He] simply claim[s] that [Truist's] actions caused the late payments—something that [can] be resolved through factfinding." <u>Id</u>. at *5 n. 3Third, even if it were a legal dispute, Truist was still require to report

[4] <u>Lyons</u>, 455 F.Supp.3d at 748-49 ("Even if the reports are technically accurate, they suggest that plaintiff is either ignoring the debt or cannot repay it and, therefore, is a bad credit risk. In fact, as COAF surely knew and

Abukhodeir v. AmeriHome Mortg. Co., LLC, 2021 WL 3510814, *4 (M.D. Fla. Aug. 10, 2021); Bush v. RoundPoint Mortg. Servicing Corp., 122 F. Supp. 3d 1347, 1348 (M.D. Fla. 2015); *Shannon*, 764 F.Supp.2d at 722 (finding Equifax's report is inaccurate because it "could leave the impression that Plaintiff never even attempted to pay his bill, even though Plaintiff had in fact mailed a check to cover the debt. A seeming failure to attempt to pay could, in turn, adversely affect Plaintiff's ability to obtain credit."), Wallace v. Equifax.

The facts in the case sub judice more akin to Abukhodeir than Braun. Unlike the plaintiff in Braun, but like the plaintiff in Abukhodeir, after learning that his monthly payment had been reported late, Mr. Alston called Truist directly and was assured that it "would delete any late fees Plaintiff[] incurred and help [him] resolve the issue," ECF 98-1 at ¶¶ 7, 8 & 21, which could be construed as an acknowledgment by Truist that it was at least partially responsible. Abukhodeir, 2021 WL 3510814, at *4. In addition, like in Abukhodeir, Mr. Alston had sufficient funds to cover the payment, he authorized Truist to deduct the payment, and his payment would have been made but for Truist's failure to process the payment. Id.

### C. Truist's report that Plaintiff had 2 BB&T accounts was inaccurate and/or misleading.

It is undisputed that Truist failed to delete the fraudulent account and reported two duplicate BB&T accounts. See Busic Depo. 90:1-96:10 (acknowledging that the account closed due to fraud should be blocked from reporting but unable to explain "why fraud made a decision to continue

---

as all defendants now know, plaintiff was unaware that Loan # 1 had not been paid and had no reason to know or to make any payments. Thus, the way the debt is being reported can be expected to adversely affect credit decisions."); Plotzker, 2020 WL 1548956, at *5 ("[O]mitting information concerning the reason a debt was paid for less than full dollar can render a technically accurate report misleading under the FCRA"); Radley, 2018 WL 3210515, at *4 (While "Equifax is reporting technically correct, … it [is] not accurate under the FCRA because it is correct but misleading… Accordingly, the [Plaintiff] alleges sufficient facts to state a claim that the reporting information was inaccurate (i.e., materially misleading)…")

7

reporting an account"); 43:4-10 (acknowledging the fraud account should be deleted), 61:6-16 (same), 64:13-20 (admitting that it did not request the fraud account be deleted for 138 days).

### D. No reasonable jury could find that Truist conducted a reasonable investigation.[5]

Sections 1681s-2(b)(1)(A) and (B) govern the furnisher's activities that comprise the investigation of the dispute. Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 617 (6th Cir. 2012) ("[C]ourts have interpreted [§ 1681s–2(b)(1)(B)'s] review requirement alongside the investigation requirement in § 1681s–2(b)(1)(A).") And sections 1681s-2(b)(1)(C)-(E), which are discussed infra § E, govern the furnisher's conduct with respect to post-dispute reporting.

A reasonable investigation requires a "careful inquiry" into the disputed matter. Johnson v. MBNA American Bank, NA, 357 F.3d 426, 430 (4th Cir. 2004). Whether a furnisher's investigation is considered "reasonable" is based on an "evaluation of information within the furnisher's possession, such as correspondence between the consumer and the furnisher, the data identified by the reporting agency as disputed, and the furnisher's other records relating to the disputed account." Daugherty v. Ocwen Loan Servicing, LLC, 701 F. App'x 246, 253 (4th Cir. 2017) (citing Saunders v. Branch Banking & Tr. Co., 526 F.3d 142, 151 (4th Cir. 2008) (holding that a bank's internal

---

[5] Defendant argues that Plaintiff raised a new legal theory under section 1681s-2(b)(2) for failing to complete its investigate and report back the dispute results within 30 days. Truist's obligation to complete its dispute result within 30 days is under section 1681s-2(b) generally, including 1681s-2(b)(1). Mavilla v. Absolute Collection Serv., Inc., 539 F. App'x 202. 208 (4th Cir. 2013) ("As the court explained, under the FCRA, when a furnisher of information to consumer reporting agencies is notified of a credit dispute, it must "conduct an investigation with respect to the disputed information," "review all relevant information provided by the consumer reporting agency ...," and "report the results of the investigation to the consumer reporting agency" within thirty days of being notified of the dispute.") (citing 15 U.S.C. § 1681s–2(b)(1), (2), 15 U.S.C. § 1681i(a)); Harb v. Westlake Servs. LLC, 2024 WL 4189835, *9 (M.D. Fla. Sept. 10, 2024) ("The duty of a furnisher [to reasonably investigate] under § 1681s-2(b) is *a component of the larger reinvestigation duty* imposed by § 1681i(a) on CRAs themselves," which includes the timely completion of all investigations, reviews, and reports within thirty days of notification.") (citing Hinkle, 827 F.3d at 1301).

records of ongoing correspondence could support a conclusion that the bank intended not to furnish accurate information to the reporting agencies).

>    1. **Truist's investigation was unreasonable because it did not consider all information in the CRA's ACDV.**

It is undisputed that Truist relies on an ACDV to respond to consumer disputes. It is also undisputed that the CRA has two fields to provide information that informs Truist about the nature of the dispute. One field is the "dispute type" field, which provides "the dispute code … on the ACDV" from the CRA, see Busic Depo. at 40:2-5. The other field is the "Client Feedback" field that provided "notes" from the CRA that pertained to the dispute, see id. at 37:6-13 ("[T]he client feedback field … are the notes that were included on the ACDV from the bureau…")

When purportedly investigating Plaintiff's dispute, Truist's dispute analyst **never addressed** the information in the Client Feedback. For example, Truist received an ACDV case 05/23/2022-6717948, which contained the following statement in the Client Feedback:

> INVOLVED IN LITIGATION CONSUMER CLAIMS SPOKE WITH TWO TRUIST EMPLOYEES AIYANNA AND AND CONSUNLA BOTH AGREED NOT LATE JAN 2022 CAN VERIFY BY CALLING 844 487 8478 OLD ACCT ENDED 0380||||||||||||||||||||||

Truist000006; Busic Depo. at 55:8-16. The Dispute Type field provided code "106 - Disputes present/previous Account Status/Payment Rating/Account History, see Truist000007. Truist's processed the dispute by accessing the FIS, which is the database for credit reporting, and verified the status, payment rating and account history, see id. Truist's actions lined up completely with the dispute code and ignored the client feedback field. When asked why Truist did not consider the information in the client feedback field, Truist stated "[t]hat would not fall within the scope of the investigation." Busic Depo. at 55:8-16 (Q On here, it says client feedback, that "Consumer claims that he spoke with two Truist employees, one named Aiyanna and the other named Consunla." As

9

a part of its investigation, did Truist speak with or contact either of those two employees? A No, we did not. That would not fall within the scope of the investigation.)[6]

Had Truist considered the information in the Client Feedback field, then Truist could have contacted the "Truist's employees Aiyanna and Consunla," Truist000006; Busic Depo. at 55:8-16, both of whom could have informed Truist that Plaintiff did his part in making the payment and was not late in January 2022. Truist's policy to solely rely on the dispute type, see Busic Depo. at 108:18-20 ("what drives the investigation is the dispute type"); 52:1-4 ("the dispute type drives what the client is saying is wrong"), is unreasonable because it does not consider all the Client Feedback (aka "FCRA Relevant Information" field in the CRA's version of the ACDV), which contains specific, relevant information about the dispute. Daugherty, 701 F. App'x at 253 (reasonable investigation must consider "the data identified by the reporting agency as disputed")

### 2. Truist's investigation was unreasonable because it did not consider Plaintiff's direct disputes.

It is undisputed that Plaintiff disputed the BB&T account directly with Truist on at least three occasions, including three phone calls and three letters, see 98-1 at ¶¶ 7, 21, 28, 16, 23 & 48; Truist000073-76. Plaintiff's direct disputes contained information that was relevant to his direct disputes, see Truist000073. Therefore, a reasonable investigation of Plaintiff's indirect disputes required Truist to consider the direct disputes. Daugherty, 701 F. App'x at 253 (reasonable investigation must consider "correspondence between the consumer and the furnisher"); Kim v. BMW Fin. Servs., 142 F.Supp.3d 935 (C.D. Cal. 2015) ("Defendant should have considered

---

[6] Another example of Truist's utter disregard of the Client Feedback field can be found in its response to ACDV case 06/10/2022-6760666. Here, Truist did not even bother to gain an understanding of what the CRA was stating. Busic Depo. att 56:21-57:4 (Q In the client feedback of this particular case, it says, "Previously control number." What does that mean? A I don't know. Again, this comes to us from the bureau, so we don't always have context or clarity as to what's being stated.

information it received directly from Plaintiff" through earlier 1681s-2(a)(8) dispute in conducting its 1681s-2(b) investigation), aff'd, 702 Fed. Appx. 561 (9th Cir. 2017).[7]

### 3. Truist's investigation was unreasonable because it did not consider Plaintiff's dispute letters.

It is undisputed that Truist **never addressed** the information in Plaintiff's dispute letter when conducting its purported investigation of Plaintiff's dispute. 106: For example, Truist received an ACDV case 09/15/2022-6984072, which disputed three Truist accounts, including the BB&T 0380, BB&T 5806 and SunTrust accounts, see 101:22-102; Truist000053. However, Truist only investigated BB&T 5806, see Busic Depo. at 107:3-8.

When asked why Truist did not consider the information in the dispute letter, Truist stated "[t]he ACDV that we receive[] is specific to an individual account … regardless of what other information may be provided. In a case where in the client's letter to Experian, they listed multiple cases, it would be incumbent upon the bureau to send us a separate ACDV for each account number." Busic Depo. at 107:18-108:9. Continuing, Truist testified that "what drives the investigation is the dispute type" listed in the ACDV, see id. 108:11-20, and "…[w]e would only investigate the account number listed on the ACDV, see id. Also see 112:18-113:2-3.

Had Truist considered the Plaintiff's dispute letter, then Truist would have been aware that Plaintiff was claiming that he made the payment on time and could have considered the attached check and postmarked envelope, see Truist 000053; Busic Depo. 104:14-105:5. However, because Truist cabined its investigation to the dispute code, Truist reviewed the credit reporting host database, called FIS, and "updated the account status. Payment rating, date closed. High balance

---

[7] The CFPB has supported this position, stating its expectation that furnishers "review and consider 'all relevant information' relating to the dispute, including documents that the CRA includes with the notice of dispute or transmits during the investigation, *and the furnisher's own information with respect to the dispute*." CFPB, The FCRA's Requirement to Investigate Disputes and Review "All Relevant" Information Provided by Consumer Reporting Agencies (CRAs) About the Dispute, CFPB Bulletin 2013-09 (Sept. 4, 2013).

11

amount. Middle name and address fields." 102:4-12. Because the dispute letter was attached to the ACDV, Truist's decision to not to address the letter was not reasonable.

### 4. Truist's investigation was unreasonable because it did not consider other relevant records in its possession.

It is undisputed that Truist has other computer systems containing information that was relevant to Plaintiff's disputes. Busic Depo. at 77:16-79:22. For instance, Plaintiff's disputes regarding his SunTrust account were related to the check he mailed on May 13, 2022. However, the image of that check is "not [] contained in the host system" that Truist exclusively reviewed in response to each one of Plaintiff's disputes. Instead, the image of the check is "contained in a separate image system entirely," see id. at 79:15-22. Similarly, Plaintiff's disputes of his BB&T accounts were reliant on the credit card statements, see id. at 118:13-21. However, "[a]ccount statement are in a separate system … [than] the host system." 79:10-14.

Had Truist accessed the other systems with respect to Plaintiff's dispute of the SunTrust account, it would have determined that the check was placed with the post office on May 13, 2022, and could have reported the payment as current, included a narrative[8] explaining the reason for the late payment, or deleting the disputed information due to its inability to verify when it received the check.[9] Truist's failure to review to access its systems containing "other records relating to the dispute account" was not reasonable. Daugherty, 701 F. App'x at 253.[10]

---

[8] Truist acknowledges a narrative comment can be added to the tradeline. Busic Depo. at 53:16-19; 91:18-21.

[9] Truist acknowledge that a check may not post in a timely manner, Busic Depo. at 82:5-9, and that he would have to guess when the check was received, see id. 85:3-86:12. While Defendant claims "check-payment processing" was not within the scope of the deposition, Truist was required to verify the check was received during its investigation. Hinkle v. Midland Credit Mgt. LLC, 827 F.3d 1295, 1303 (11th Cir. 2016). Had it done so, then Truist's dispute analysts would have obtained the information from the appropriate department.

[10] The CFPB has cited furnishers who failed to have policies and procedures to instruct dispute handlers to properly conduct a reasonable investigation, including directing them to "compare the disputed information to all available information in all systems of record that could contain information relevant to a consumer's dispute." CFPB, Supervisory Highlights Consumer Reporting Special Edition, Issue 14, at 13 (Mar. 2, 2017)

### 6. Truist's investigation constitute a "Data Conformity" review that is considered per se unreasonable.

It is undisputed that Truist responded to each dispute by reviewing its credit reporting host database and simply verified that the information in its screens matched with the information in the CRA records, as displayed on the ACDVs. See Busic Depo. at 77:16-79:22; 101:1-105:5.[11] Courts have uniformly found that investigations that merely consist of data conformity are not only negligent but potentially a willful violation of the FCRA. See, e.g. Myers v. Am. Educ. Servs., 2021 WL 859538, at *7 (S.D. Ohio Mar. 8, 2021) ("AES verified that the disputed information was accurate. Yet the only 'verification' AES did was compare the requested data on the ACDV form to its own internal records…. This minimal effort amounts to nothing more than a 'merely cursory review.'") (citing Boggio, 696 F.3d at 616 (6th Cir. 2012).

Here, Truist's actions were worse than the average data conformity review. Specifically, while acknowledging that Plaintiff had not filed bankruptcy and his disputes did not in any way reference bankruptcy, see Busic Depo. at 129:8-130:1, Truist analyst *routinely* searched PACER for bankruptcy status in response to Plaintiff's dispute of the SunTrust account. Busic Depo. at 74:2-19, 87:1-12, 96:18-97:4, 113:8-20, 116:3-19 (review PACER);

### E. Truist violated §§ 1681s-2(b)(1)(C)-(E)'s requirement to report the account as disputed in response to an dispute from a CRA.

In Saunders, the Fourth Circuit directly chastised Truist for its unreasonable policy of never reporting a debt as disputed. The Court noted that while section 1681s-2(a)'s requirement to report a debt as disputed, the interplay between sections 1681s-2(a) and 1681s-2(b) makes a failure to report a dispute actionable under section 1681s-2(b) if a furnisher does not report a dispute. Saunders, 526 F.3d at 150. As in Saunders, the Plaintiff has "presented evidence that (1) [Truist's]

---

[11] Also see id. 46:2-10, 48:9-49:8, 73:21-75:6, 77:7-79:22, 86:17-87:22, 96:15-97:15, 101:1-105:5

13

records reflected the ongoing dispute over the debt, (2) [Truist's] reports to the CRAs did not reflect that ongoing dispute, and (3) [Truist] *intended* not to report that ongoing dispute." Id., 526 F.3d at 149-50 (4th Cir. 2008).[12]

While numerous "federal district courts have granted a plaintiff partial summary judgment under the 'failure to report a debt as disputed' theory of liability" for negligence, Hrebal v. Nationstar Mortg. LLC, 385 F.Supp.3d 849, 853 (D. Minn. 2019) (citing Long v. Pendrick Capital Partners, LLC, 374 F. Supp. 3d 515, 527–31 (D. Md. 2019); Wood v. Credit One Bank, 277 F. Supp. 3d 821, 853-55 (E.D. Va. 2017); Ballinger v. Ocwen Loan Servs., LLC, No. 15-cv-252 (JAJ/HCA), Doc. No. 190 at 12-15 (S.D. Iowa Sept. 25, 2017); Vasquez-Estrada v. Collecto, Inc., 2015 WL 6163971, at *5-6 (D. Or. Oct. 20, 2015); the United States District Court for Minnesota held, Sheffield Financial, a division of Truist, that utilized Truist's policies, for willfully violating the FCRA under the failure to report a debt as disputed claim. Sherman v. Sheffield Fin., LLC, 627 F. Supp. 3d 1000, 1019 (D. Minn. 2022) ("As the parties agree, willfulness is generally a question of fact for a jury. See Hrebal II, 385 F. Supp. 3d at 851. There are, however, no undisputed facts for a jury to resolve here. It is undisputed Sheffield had a policy of refusing to mark accounts as disputed. This policy violated FCRA as a matter of law and was based on an objectively unreasonable interpretation of the statute. And Sheffield acted in accordance with this policy here. Therefore, Sherman is entitled to judgment as a matter of law that Sheffield willfully violated FCRA, and § 1681n damages are available.)

**II.     The Issue of Plaintiff's Damages Must Be To The Trier Of Fact**

---

[12] Despite the Saunders holding, Truist claims it does not have to report a debt as disputed because the CRRG Metro II does not require it to do so. Busic Depo. at 53:21-54:4. This argument has been routinely rejected by courts. Coulter v. Chase Bank USA, N.A., 2020 WL 5820700, *12 (E.D. Pa. Sept. 30, 2020); Robbins v. CitiMortgage, Inc., 2017 WL 6513662, *9 (N.D. Cal. Dec. 20, 2017))

Plaintiff has provided a declaration that includes nearly 20 paragraphs of detailed testimony on his emotional distress, see 98-1 at ¶¶ 65-81. This satisfies the threshold of specificity in a Plaintiff's testimony. See Best v. Fed. Nat'l Mortg. Ass'n, 450 F. Supp. 3d 606, 635 (D. Md. 2020) (While Plaintiff's evidence here only marginally exceeds that threshold, it is sufficient to proceed, even if the damages ultimately awarded would be minimal.

Last, Defendant argues that Plaintiff's declaration included hearsay. To the extent that Plaintiff's declaration contained hearsay, at trial the evidence will be admissible by calling witnesses with personal knowledge. Myrick v. Equifax Info. Servs., LLC, 2017 WL 4798154, at *3 (E.D.N.C. Oct. 24, 2017); Coulter, 2020 WL 5820700, at *8.

## CONCLUSION

For the reasons stated herein, Plaintiff asks the Court to enter Partial Summary Judgment against Truist and reserve trial only for the question of damages.

Dated: December 19, 2024                Respectfully submitted,

                                                         /s/ Jeffery W. Styles
Jeffery W. Styles, Esq. (Bar #20659)
Washington Legal Group, LLC
1001 Conn Ave, NW, Ste 1138
Washington, D.C. 20036
Tel: (202) 503-1708
E-mail: talston@washlegal.com

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, that the foregoing was electronically filed with the clerk of the court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jeffery W. Styles
Jeffery W. Styles, Esq. (20659)
Washington Legal Group, LLC
1001 Connecticut Ave NW #1138
Washington, D.C. 20036
Tel: (202) 503-1708
E-mail: jstyles@washlegal.com
