## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THOMAS J. ALSTON,

      Plaintiff,

v.

TRUIST BANK,

      Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Civil No. 22-2974-BAH

## MEMORANDUM OPINION

Plaintiff Thomas J. Alston ("Plaintiff" or "Alston") brought suit against Defendant Truist Bank ("Defendant" or "Truist") alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* (Count I); defamation (Count II); and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* (Count III). ECF 34 (third amended complaint). Pending before the Court are Defendant's motion for summary judgment, ECF 83, and Plaintiff's amended cross-motion for summary judgment and response to Defendant's motion, ECF 96-2.[1] Both parties filed replies. *See* ECF 108 (Defendant); ECF 109 (Plaintiff). All filings include memoranda of law, and the parties' motions and Truist's reply include exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for

---

[1] As the Court has indicated, "Plaintiff's complete opposition/cross-motion consists of (and only of): (a) the amended opposition/cross-motion, ECF 96-2, (b) the exhibits filed along with the original opposition/cross-motion, ECFs 91-1 through 91-5 (ECFs 91-1 through 91-3 being under seal), and (c) the first notice of an omitted exhibit along with the amended exhibit list, ECFs 98-1 and 98-2." ECF 107, at 4.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

the reasons stated below, Defendant's motion for summary judgment is **GRANTED**, except that Defendant's request for attorney's fees under the FCRA is **DENIED**, and Plaintiff's cross-motion for summary judgment is **DENIED**.

## I.    BACKGROUND

This case arises from Alston's two credit card accounts he maintained with Truist—one initially issued by BB&T ending in 0380 (the "BB&T Account"),[3] and the other initially issued by SunTrust with the account number ending in 2647 (the "SunTrust Account").[4] *See* ECF 83-3, at 5, 93:2–9, at 8, 147:13–21, 148:12–17. Alston opened the accounts in 2021. ECF 83-3, at 8; ECF 98-1, at 2. At various times in 2021 and 2022, Alston disputed various aspects of Truist's credit reporting related to those accounts.

### A.    BB&T Account

On November 2, 2021, Alston timely paid a $65.00 "branch payment" on the BB&T Account. ECF 83-5, at 8; ECF 83-3, at 12, 175:1–10. Plaintiff's next minimum payment on that account was due on December 5, 2021, in the amount of at least $27.00. ECF 83-5, at 6. Alston did not make a payment by the December 5 due date. ECF 83-3, at 12, 175:15–176:2; ECF 83-5, at 10. However, Alston has testified that he tried to make a late online payment on December 18, 2022, but alleged that BB&T failed to process the payment. ECF 83-3, at 12–13, 176:3-177:3.

A minimum of $64.00 was next due on the BB&T Account on January 5, 2022. ECF 83-5, at 10. Plaintiff did not make a payment by the January 5, 2022 due date. ECF 83-3, at 14 187:7-

---

[3] The BB&T account number originally ended in 0380. However, it changed twice during the period relevant to this lawsuit due to unrelated fraud claims reported by Alston. *See* ECF 83-3, at 8, 148:18–22; ECF 83-4, at 5, 25:7–9. Accordingly, the account numbers referenced in the record ending in 0380, 5806, and 2632 all refer to the BB&T Account.

[4] In December 2019, SunTrust Bank and Branch Banking and Trust Company, otherwise known as BB&T, merged, becoming Truist Bank. *See* ECF 83-4, at 5 27:6-9.

16; ECF 83-5, at 14. The next payment due date was February 5, 2022, which required a minimum payment of $112.00. However, prior to the February due date, Plaintiff made a payment on January 18, 2022, in the amount of $64.00, and then again on January 24, 2022, in the amount of $47.00. ECF 83-5, at 20; *see* ECF 83-3, at 14, 187:17–188:3. Ultimately, Plaintiff's January payments combined were still short of the February minimum payment due. *See* ECF 83-5, at 14.

Because the BB&T Account reflected no payments made by Alston between November 2, 2021, and January 18, 2022, Truist assessed the account as 30 days delinquent in the beginning of January, 30 days after Alston's missed payment in December. ECF 83-4, at 5, 27:10–28:21. Consequently, Truist reported the BB&T Account as 30 days delinquent in January of 2022.

Between May and September 2022, upon Alston raising the issue with Experian Information Solutions, Inc. ("Experian"), a credit reporting agency ("CRA"),[5] Truist received several disputes relating to the credit reporting on the BB&T Account. *See* ECF 83-1, at 9; ECF 96-2, at 11. The basis for the disputes generally involved Alston arguing (1) that Defendant had reported the incorrect month for the late payment, (2) that the account number was incorrect, and eventually (3) that the delinquency itself was inaccurate because of a purported payment or attempted payment in December. *See, e.g.*, ECF 83-7, at 4. In responding to the disputes, Truist's

---

[5] "Although the FCRA speaks of a 'consumer reporting agency,' courts often refer to such entities as 'credit reporting agencies.'" *Ahmad v. Experian Info. Sols., Inc.*, No. 23-CV-2222 (LJL), 2023 WL 8650192, at *1 (S.D.N.Y. Dec. 14, 2023) (citing *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015)). This court will follow suit since the parties have used the terms interchangeably as well. *See* ECF 83-1, at 5 (using "CRA" to mean "credit reporting agency"); ECF 91, at 8 (same). A "consumer reporting agency" is defined by the FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f). The parties do not dispute that two major CRAs referenced throughout the record here—Equifax and Experian—are consumer reporting agencies under the FCRA. *See* ECF 83-1, at 5; ECF 96-2, at 8.

3

corporate designee, Steven Busic, testified that Truist typically reviewed the "FIS"—the host system for the BB&T 5806 account—to confirm that the information in FIS matched the information on the CRA's automated consumer dispute verification ("ACDV"), which is "a form used by CRAs to communicate a consumer's credit report dispute to the furnisher of the disputed information." *See* ECF 83-4, at 4, 22:9–156; at 6, 48:7–49:8; at 8, 55:21–56:20; at 13–19, 88:8–89:2; at 17, 101:13–103:3. If the information on the ACDV did not match the FIS, Defendant testified that it would input updated information into the ACDV before submitting the ACDV back to the CRA. *See id.* However, when Truist reported the results of its investigation to the CRAs by returning the ACDV, it did not report the BB&T account as being disputed. *See* ECF 83-4, at 8, 53:11–54:19, 17 101:5–12.

On January 24, 2022, Alston emailed Experian's counsel to dispute the 30-day delinquent reporting associated with the BB&T Account. ECF 83-7, at 4. Alston wrote that "[i]t shows 30-days late for January 2022. Considering 30-days has not lapsed yet, this is patently incorrect."[6] *Id.* On May 17, 2022, following an exchange of emails, Alston again emailed Experian's counsel disputing the reporting of the BB&T Account as 30 days delinquent in January 2022 and requesting Experian to "remove the entire account." ECF 83-7, at 2. In that email, Alston noted that he "spoke with two different employees that agreed the account was not 30-days late for January 2022's payment" and that the BB&T Account was "removed back in February following one of

---

[6] In the email exchange, Experian's counsel attempted to explain to Alston that his account could become delinquent in January due to a missed payment in December, because January would be the month at which point 30 days had passed since the December due date. *See* 83-7, at 3–4. In response to counsel's statements, Alston wrote: "In December I paid on the 21st." *Id.* at 3. However, Alston does not appear to argue in a filing before the Court, nor is there any evidence in the record, to support the claim that he made any payment on the BB&T Account on December 21, 2021.

[his] disputes, but it has reappeared under a different account number. The old account number ended in 0380. The present account number ends in 5806." *Id.* Alston then asked Experian to "remove the entire account to avoid any further issues with this account."[7] *Id.* Experian then sent Defendant an ACDV to which Defendant responded[8] on June 10, 2022, indicating that the account information was accurate as of the date reported. ECF 83-4, at 6–7, 48:4-49:8; ECF 91-1, at 7–11.

The next two disputes were initiated on June 7, 2022, when Plaintiff wrote to Experian disputing (1) the reporting of the BB&T Account ending in 0380 as "open" when, Plaintiff asserts, that account was closed due to fraud and replaced with the account ending in 5806, and (2) the reporting of the BB&T Account ending in 5806 as 30 days delinquent in January 2022. ECF 83-9, at 2. As a result, Experian sent Truist two ACDVs on June 8, 2022, one related to each aspect of the dispute. ECF 83-4, at 8, 56:3-20, at 9, 61:2-16; ECF 91-1, at 12–16, 17–22. Truist responded to the first dispute on June 29, 2022, indicating that the account ending in 3080 should

---

[7] Alston also asserts that "[o]n or about February 17, 2022, Equifax notified [Truist] of Mr. Alston's February 2022 dispute by forwarding [Truist] an ACDV." ECF 96-2, at 11. The deposition testimony of Truist's corporate designee, Steven Busic, and Truist's own records appear to show that on February 15, 2022, Truist received an ACDV from Equifax on February 15, 2022, related to the BB&T Account. *See* ECF 83-4, at 63:1–64:20; ECF 91-1, at 2–4. However, that dispute was not resolved until July 5, 2022. *See id.* Busic testified that the investigation conducted in a separate ACDV received on June 10, 2022, ECF 91-1, at 19, covered the issue, so when the February 15, 2022 ACDV was "processed and reviewed, deletion has already been approved and performed," ECF 83-4, at 9, 62:1–64:20.

[8] Defendant represents that whenever it responded to a dispute through an ACDV, the information in the ACDV was provided to all CRAs through the e-OSCAR system. ECF 83-4, at 10, 65:3–66:18. The e-OSCAR system "permits the credit reporting bureaus and data furnishers to exchange information electronically." *Jones v. Experian Info. Solutions, Inc.*, No. 1:11-CV-826, 2012 WL 2905089, at *2 (W.D. Va. July 16, 2012).

be "deleted due to fr[au]d." ECF 91-1, at 18–19. Defendant responded to the second dispute on June 28, 2022, confirming that the delinquency reporting was correct. ECF 91-1, at 13–14.[9]

On July 5, 2022, Plaintiff initiated his fourth dispute with Experian, again asserting that Experian's report of the BB&T Account 30 days delinquent in January 2022 was incorrect.[10] ECF 83-12, at 2. In the letter raising the dispute, Alston wrote that "[i]n my past disputes, I provided you with bank statements showing my payment in January 2022. At a minimum, Experian should report that a payment was received in January 2022 and the account should be reported as in dispute status." *Id.* Accordingly, Experian sent Defendant an ACDV on July 20, 2022, and Defendant again indicated that the "[a]ccount information [was] accurate as of the date reported." ECF 83-4, at 13–14, 88:11–91:6; ECF 91-1, at 38.

Finally, on September 6, 2022, Plaintiff wrote to Experian to explain that the accounts ending in 0380 and 5806 were the same account, and to request "the removal of any payment history for months preceding March 2022 on the 5806 credit card."[11] ECF 83-14, at 2. Alston also attached "a February 2022" and "a March 2022 Statement for the 5806 credit card" to his September 6 correspondence. *Id.* He asserted that "Experian is correctly reporting the 0380 credit card account as Current in January 2022 but reporting 5806 credit card account as 30-days late in January 2022." *Id.* Alston reasoned that "[t]he 5806 credit card was not in existence in January

---

[9] However, Alston contends that Truist "did not notify Experian that BB&T 0380 should be deleted until July 5, 2022." ECF 96-2, at 11. Deposition testimony from Busic suggests that Truist did not notify Experian of the account number change until July 5, but that particular date is not reflected on either reports' "Date/Time Closed" entry. *See* ECF 91-1, at 14, 19.

[10] Plaintiff's July 5, 2022 letter also disputed Defendant's reporting on the SunTrust Account, discussed below. *See infra* Section I.B.

[11] Plaintiff's September 6, 2022 letter also disputed Defendant's reporting on the SunTrust Account, discussed below. *See infra* Section I.B.

2022 and should have no activity for that month." *Id.* Consequently, Defendant received an ACDV from Experian on September 14, 2022. ECF 91-1, at 51. Truist responded on September 28, 2022, by removing the entire payment history for account ending in 5806 because that account was closed due to fraud in August 2022 and replacing it with an account ending in 2632. ECF 83-4, at 17, 101:13–103:3; ECF 91-1, at 52–53.

### B.    SunTrust Account

On March 1, 2022, Plaintiff timely made a $5,400 payment on the SunTrust Account. ECF 83-16, at 2. A minimum of $58.00 was next due on the SunTrust Account on April 18, 2022. ECF 83-16, at 2. Plaintiff did not make a payment on the April due date. ECF 83-16, at 5; *see also* ECF 83-3, at 9, 151:13–152:13. The next payment was due on May 18, 2022, for a minimum amount of $126.00. ECF 83-16, at 5. However, before the May due date, Plaintiff made a payment of $58.00 on April 21, 2022 and a second payment of $27.00 on May 6, 2022. ECF 83-16, at 9. Plaintiff's two payments ultimately fell short of the May payment minimum. *See* ECF 83-16, at 5, 9.

The next payment on the SunTrust Account was due on June 18, 2022, for a minimum amount of $109.00. ECF 83-16, at 11. Account documents do not reflect a payment from Plaintiff by that due date. *See* ECF 83-16. Instead, records reflect that Alston made a payment of $177.00 on June 29, 2022 and another payment of $213.00 on July 8, 2022. ECF 83-16, at 14. Plaintiff asserts that he mailed the $213.00 payment to Defendant sometime in May of 2022. ECF 83-3, at 4, 86:15–87:5, at 10, 154:21–156:5. Alston attached to some of his disputes, and produces in this litigation, a photograph of an envelope postmarked May 13, 2022, which he claims included the $213.00 check, and a photograph of a check for $213.00 dated May 13, 2022 and addressed to

7

Truist but with an unknown account number referenced on the check's memo line.[12] ECF 83-3, at 11, 157:22–159:13; ECF 83-18, at 2; ECF 83-17, at 2; *see also* ECF 83-19, at 2, 4. However, records reflect that Truist processed a $213.00 payment from Alston on July 8, and posted that payment to the SunTrust Account that same day. *See* ECF 83-17, at 2; ECF 83-3, at 10; ECF 83-16, at 14.

Because the SunTrust Account reflected no payments from Plaintiff from May 6 until June 29, Defendant reported the SunTrust Account as 30 days delinquent in June 2022, based on the time that had passed since the missed payment in May. ECF 83-4, at 11, 76:4–12. Between July and September 2022, Defendant received five disputes from Experian or Equifax Information Services, Inc. ("Equifax"), another CRA, relating to the credit reporting on the SunTrust Account.

Plaintiff wrote to Experian on July 5, 2022 to dispute the reporting on the SunTrust Account. ECF 83-12, at 2. Plaintiff also initiated two disputes on July 12, 2022, writing to Equifax and Experian that the SunTrust Account was "being inaccurately reported as 30-days late in June 2022." ECF 83-19, at 2–6. Alston referenced in those letters the purported May 13, 2022 check, and stated that "a copy of the check" was enclosed which "should have been credited by Truist Bank on or by June 1, 2022." ECF 83-12, at 2; ECF 83-19, at 2. Consequently, Equifax sent Defendant an ACDV on July 14, 2022, and Experian sent Defendant an ACDV on July 20, 2022. ECF 83-4, at 11, 73:18-75:6, at 13, 86:17–87:22; ECF 91-1, at 28, 33. Defendant responded to both ACDVs during the first week of August 2022, indicating that both Equifax and Experian were correctly reporting the SunTrust Account current through May 2022 and providing an updated

---

[12] The check is signed by Mr. Alston but has an address related to an LLC that does not include Mr. Alston's name or the address he noted on the envelope he allegedly used to send it. *See* ECFs 83-17, at 1; 83-18, at 2. The memo line notes that the check is payment "[f]or Credit Card 9173," ECF 83-18, at 2, a number that is not associated with the Suntrust Account.

account history, which showed the SunTrust Account as 30 days delinquent in June 2022. ECF 91-1, at 30, 35.

Sometime in August of 2022, Plaintiff disputed Experian's reporting on the SunTrust Account again and, in turn, Experian sent Defendant an ACDV on August 17, 2022. ECF 91-1, at 46; ECF 83-4, at 15–16, 96:15–97:15. Defendant responded to the ACDV on September 1, 2022, continuing to report the SunTrust Account as 30 days delinquent in June 2022 and providing an updated account history, which showed the account as current in July 2022. ECF 91-1, at 47–48.

Plaintiff initiated the fourth and fifth disputes on September 6, 2022, when he wrote to Equifax and Experian claiming that the SunTrust Account "is inaccurate" because "[t]he account was not late in June 2022.". ECF 83-23, at 2–3. In the letter to Experian, Alston again contended that the $213 payment was mailed to Truist on May 13, 2022, and would have been received "before June 1, 2022." ECF 83-23, at 2. As a result, Experian sent Truist an ACDV on September 14, 2022, and Equifax sent Truist an ACDV on September 16, 2022. *See* ECF 83-4, at 13, 113:4–114:11, at 13–14, 116:2–117:19; ECF 91-1, at 64, 69. According to the ACDVs, Equifax was reporting the payment history on the SunTrust Account as 30 days delinquent in May and July 2022, and Experian was reporting the payment history as 30 days delinquent in June 2022. *Id.* Defendant responded to both ACDVs on September 28, 2022, correcting Equifax's reporting by stating that the SunTrust Account was 30 days delinquent only in June 2022, and confirming Experian's reporting. *Id.*

As he is wont to do,[13] Alston sued Truist alleging error in the investigation and actions taken in responding to Alston's disputes of both accounts. *See* ECF 34. Discovery has closed, *see* ECF 51, and the parties' summary judgment motions are now ripe for decision.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).

---

[13] Alston is a "[f]requent-filer" of FCRA claims in this Court. *Alston v. Resurgent Cap. Servs., L.P.*, Civ. No. DLB-23-1176, 2023 WL 8934025, at *1 (D. Md. Dec. 27, 2023). Indeed, Truist reports that he "has filed more than 35 FCRA cases in his own name since 2011 and is responsible for many more." ECF 83-1, at 4 (collecting cases); *see also, e.g., Alston v. Creditors Interchange Receivable Mgmt., LLC,* Civ. No. AW 12-1708, 2012 WL 4370124, at *1 (D. Md. Sept. 21, 2012) ("It is apparent from the pattern of cases described above and in the caption of this Order that Mr. Alston and his family are engaged in an enterprise of Fair Credit Reporting Act litigation, and are profiting from it."); *Alston v. Branch Banking & Tr. Co.*, Civ. No. GJH-15-3100, 2018 WL 4538538, at *3 (D. Md. Sept. 20, 2018) ("The Court will evaluate Alston's pleading and motions filed in this action to determine if such filings were made in bad faith, but in doing so the Court will not ignore the obvious—the Alston family is engaged in, and profiting from, 'an enterprise of [FCRA] litigation.'" (quoting *Alston v. Creditors Interchange Receivable Mgmt., LLC*, Civ. No. DKC 12-1709, 2012 WL 4370124, at *1 (D. Md. Sept. 21, 2012))).

"A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

### A.   Count One: FCRA

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*,

11

551 U.S. 47, 52 (2007) (first citing 84 Stat. 1128, 15 U.S.C. § 1681; and then citing *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001)). "To this end, FCRA requires [CRAs] to follow procedures in reporting consumer credit information that both 'meet[] the needs of commerce' and are 'fair and equitable to the consumer.'" *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 147 (4th Cir. 2008) (alteration in original). However, "[i]n addition to the duties it imposes on [credit reporting agencies], FCRA also imposes duties on 'furnishers of information.'" *Id.* at 147–48 (quoting 15 U.S.C. § 1681s-2). "While the statute does not explicitly define 'furnishers' of credit information, '[t]he most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies.'" *Himmelstein v. Comcast of the Dist., L.L.C.*, 931 F. Supp. 2d 48, 52 (D.D.C. 2013) (internal quotation marks omitted) (quoting *Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 35 n.7 (1st Cir. 2010)). Neither party here disputes that Defendant is a furnisher of information under the FCRA. *See* ECF 83-1, at 16.

"The FCRA imposes two sets of duties on furnishers, one under § 1681s–2(a) and one under § 1681s–2(b)." *Himmelstein*, 931 F. Supp. 2d at 52. Under the first set of duties, "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate," nor shall that person "furnish information relating to a consumer to any consumer reporting agency if—(i) the person has been notified by the consumer . . . that specific information is inaccurate; and (ii) the information is, in fact, inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A)–(B). Moreover, a furnisher of information must correct and update the information provided so that it is "complete and accurate." *Saunders*, 526 F.3d at 148 (quoting 15 U.S.C. § 1681s-2(a)(2)).

The second set of duties arises where "a consumer disputes the accuracy of information that the furnisher reports." *Id.* "If a consumer notifies a CRA that he disputes the accuracy of an item in his file, FCRA requires the CRA to notify the furnisher of the dispute," and "[u]pon receipt of this notice, a furnisher must" take certain actions. *Id.* Specifically, the furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

The FCRA imposes civil liability on any person who willfully or negligently fails to comply with any requirement under the Act. *Id.* §§ 1681n(a), 1681o(a); *Saunders*, 526 F.3d at 149. "A consumer may recover compensatory damages *or* statutory damages of not more than $1,000, punitive damages, and attorneys fees from any [such] person[.]" *Saunders*, 526 F.3d at 149 (citing 15 U.S.C. § 1681n). However, although the "FCRA explicitly bars private suits for violations of § 1681s–2(a)," "consumers can still bring private suits for violations of § 1681s–

13

2(b)." *Id.* (first citing 15 U.S.C. § 1681s-2(c); and then citing *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431–32 (4th Cir. 2004)).

It appears that "the following three elements are essential to [a FCRA failure to reasonably investigate claim]: '(1) the plaintiff submitted a dispute over the accuracy of information on a credit report to a [CRA]; (2) the [CRA] notified the furnisher of that dispute; [and] (3) the furnisher failed to conduct a reasonable investigation to determine whether the disputed information can be verified." *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 253 (4th Cir. 2025).[14] Implicit in these elements is an understanding that the incorrectly reported information is, in fact, inaccurate or incomplete. *See Magruder v. Educ. Sys. Fed. Credit Union*, 194 F. Supp. 3d 386, 390 (D. Md. 2016); *see also Chiang*, 595 F.3d at 38 ("In light of the parallel obligations imposed on CRAs and furnishers—and the narrow purpose of the amendments to the FCRA—that same rationale supports requiring a showing of actual inaccuracy in suits against furnishers.").

Plaintiff alleges that Defendant violated the FCRA by failing to conduct reasonable investigations in response to multiple disputes challenging the delinquent status of two credit card accounts. ECF 96-2, at 21. Defendant responds by arguing that Plaintiff's FCRA claim "fails as a matter of law because: (a) the information Truist reported to the credit reporting agencies was factually accurate; (b) there is no evidence that Alston sustained any actual damages as a result of Truist's reporting; (c) there is no evidence that Alston suffered any legally cognizable emotional damages as a result of Truist's reporting; and (d) there is no evidence that Truist committed a willful violation of the FCRA." ECF 83, at 1; ECF 83-1, at 5. Alston counters that he is entitled to summary judgment on three issues: (1) "Truist's report that Mr. Alston was 30 days late on his

---

[14] In *Roberts*, the Fourth Circuit acknowledged that it had "yet to delineate the elements of an FCRA failure to reasonably investigate claim," but went on to cite with favor the lower court's description of the three essential elements of such a claim. 131 F.4th at 249.

SunTrust account was inaccurate"; (2) "Truist's report that Mr. Alston was 30 days late on his BB&T account was inaccurate, incomplete or misleading"; and (3) "Truist's investigation was unreasonable because it did not consider all information in the CRA's ACDV" and "[n]o reasonable jury could find that Truist conducted a reasonable investigation." ECF 109, at 3, 8. Alston also contends that the issue of damages should proceed to a trier of fact. *Id.* at 14.

To the extent necessary, the Court addresses the parties' arguments in turn.

### 1. Accuracy and Completeness of Information Reported

The "FCRA requires furnishers to determine whether the information that they previously reported to a CRA is 'incomplete or inaccurate.'" *Saunders*, 526 F.3d at 148 (quoting 15 U.S.C. § 1681s–2(b)(1)(D)). "In so mandating, Congress clearly intended furnishers to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information misleading." *Id.* Thus, "a report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409, 415 (4th Cir. 2001) (cleaned up).

Furthermore, as the Fourth Circuit recently explained in *Roberts v. Carter-Young, Inc*, the failure to investigate an alleged "inaccuracy (or incompleteness)" is only actionable if the reported information is "objectively and readily verifiable by the furnisher." 131 F.4th at 250, 252. The court observed that "[i]naccuracy or incompleteness under the FCRA is not synonymous with legally recoverable or legally valid." *Id.* at 251. "For instance, a dispute that involves complex fact-gathering and in-depth legal analysis of the sort that courts would typically perform is not objectively and readily verifiable." *Id.* And "[a] dispute that implicates unsettled questions of law and requires credibility determinations and quasi-discovery isn't either." *Id.* On the other hand, the court expressed that "[w]hether a debt has been paid could, in some instances, be objectively

and readily verifiable," as could some "claims that alleged debts never occurred" or "some disputes that implicate legal questions and legal doctrines." *Id.* at 252.

i. *Delinquencies*

Alston argues that the inaccurate or incomplete information that Truist failed to correct after it was notified of his disputes by the CRAs was the status of both of Alston's accounts as 30 days delinquent. ECF 96-2, at 27. With respect to the BB&T Account, Alston identifies two "genuine issues of fact as to whether the [Defendant]'s reporting was inaccurate when it reported Mr. Alston as 30 days late in January 2022." *Id.* "First," Alston argues, "there is a genuine issue of fact as to whether reporting Mr. Alston as late in January 2022 when [Truist] claims that Mr. Alston was late on his December 2021 payment" was inaccurate. *Id.* Second, Alston argues that "there is a genuine issue of fact of whether [his] non-payment in December [of] 2021 was his or [Truist]'s fault." *Id.* With respect to the SunTrust Account, Alston makes similar arguments— i.e., (1) that there is a genuine dispute of material fact as to whether reporting Alston as late in June 2022 was accurate when Truist claims he was late on his May 2022 payment, and (2) that there is a genuine dispute of material fact as to who is at fault for Alston's alleged nonpayment in May 2022 since Alton alleges he mailed a check to Truist on May 13 that was not credited to his account until July of 2022. *See id.*

The Court agrees with Truist that there is no evidence on this record from which a finder of fact could reasonably infer that Truist's response to the CRA's ACDVs failed to correct any patently inaccurate information with respect to either of Alston's credit card accounts. First, the record reflects that Truist's reporting of Alston's accounts as 30 days delinquent in the month they became over 30 days past due, rather than by reference to the month of the originally missed due date, is in accordance with Truist's general delinquency reporting policy. *See* ECF 83-4, at 11, 76:4–12; *see also* ECF 83-7, at 3–4 (Experian counsel's explanation to Alston of how

16

delinquencies are reported).  Alston, on the other hand, cites no authority for the proposition that such a report is "inaccurate" under the FCRA.  After all, Alston was, in fact, 30 days late on his payments.  And even if Truist's report of delinquency could be characterized as inaccurate, Alston makes no effort to explain *why* the particular month the delinquency is reported makes a difference.

Second, there is no dispute of material fact as to the accuracy of Truist's determination that Alston was 30 days delinquent on the BB&T and SunTrust Accounts in the months of January 2022 and June 2022, respectively.  Alston testified that he did not make the payment due on December 5 or at any time during the month of December 2021 with respect to the BB&T Account. *See* ECF 83-3, at 12, 175:15–176:2, at 13, 178:16–20, 179:14–180:2.  He now argues that fault for his nonpayment does not, however, lie with him and asserts that an electronic payment he attempted to make in mid-December was not processed by Truist. *See* ECF 98-1, at 2; *see also* ECF 83-3, at 12–13, 175:15–177:3.  Likewise for the SunTrust Account, Alston admits that he missed the payment due in April and further concedes that his subsequent payments did not meet the minimum amount due in May, but he contends that the SunTrust Account should have reflected a payment of $213.00 on or shortly after May 13, 2022.  ECF 83-3, at 10–11, 153:11–159:13. Regardless of their accuracy, Alston's fault-based arguments do not alter the conclusion that the BB&T and SunTrust Accounts were, in fact, 30-days delinquent during the periods for which Truist reported them as such.  Consequently, summary judgment in favor of Defendant is warranted on these claims.

### ii.   *Disputed Status*

Even if Truist's credit reporting did not contain *inaccurate* information, Alston further claims that Truist's reporting was nonetheless *incomplete* because it failed to note that Alston's accounts were in disputed status, and also failed to note the reason for these disputes. *See* ECF 96-2, at 30.  Alston is correct that "[f]ailing to note that a consumer has disputed an account may

17

in some circumstances qualify as a material omission" that can render the reported information misleading such that it is deemed incomplete under the FCRA. *Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1011 (D. Minn. 2022). "This is so because furnishers could otherwise provide materially misleading but technically correct information that . . . misrepresents the consumer's creditworthiness as well as how the consumer handled the debt at issue." *Id.* (citing *Saunders*, 526 F.3d at 148–50); *see also Roberts*, 131 F.4th at 250 ("[I]n *Saunders* . . . we held that failing to report the fact that a debt is disputed renders the reporting of the debt inaccurate.").

In *Saunders v. BB&T*, the Fourth Circuit rejected the contention that "reporting a debt without reporting its disputed nature can *never* be deemed inaccurate as a matter of law" under the FCRA. 526 F.3d at 149 (emphasis in original). There, BB&T had failed to properly record a loan the plaintiff (Saunders) secured to purchase a vehicle, later learning of the mistake when Saunders "'kept contacting BB&T,' attempting to pay down the loan." *Id.* at 146. After BB&T eventually recorded the loan in its computer system, it attempted to collect the debt from Saunders, but with late fees and penalties. *Id.* at 145–46. After BB&T refused Saunders' request to waive late fees and penalties, Saunders refused to pay down the loan. *Id.* at 146. BB&T then repossessed Saunders' car and reported "Saunders' loan as 'in repo[ssession] status' to [CRAs], causing Saunders' credit score to drop" substantially. *Id.* After Saunders raised an FCRA challenge, the Fourth Circuit held that "given the evidence before it, the jury could reasonably conclude that BB&T's decision to report the debt without *any* mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'" *Id.* at 150 (emphasis in original). In so holding, the court reasoned that "if a consumer has a meritorious dispute . . . the consumer's failure to pay the debt does not reflect financial irresponsibility." *Id.* The Fourth Circuit also found unpersuasive "BB&T's contention that a furnisher's reporting of an ongoing

dispute of a debt is superfluous once a consumer has filed a dispute with any CRA" because "[a]mong other things, when a furnisher reports a dispute, its report confirms that the consumer has actually contacted the furnisher and explained that the consumer believes he does not owe the debt." *Id.* at 150.

While *Saunders* holds that some kinds of credit disputes can trigger a reporting requirement under the FCRA, it leaves open the broader question of whether *any* kind of dispute triggers such a requirement. In *Saunders*, "BB&T additionally contend[ed] that Saunders' dispute of the debt lacked merit, and thus BB&T had no obligation to report the dispute." *Id.* at 151. "Because neither party ha[d] suggested otherwise," the Fourth Circuit "assume[d] without deciding that a furnisher incurs liability under § 1681s–2(b) only if it fails to report a *meritorious* dispute," *id.* (emphasis added), suggesting that the relative merit of a dispute can factor into the analysis, *see id.* at 150. Other circuits have suggested the same. *See, e.g.*, *Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014) ("We agree with this assessment, and conclude that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's *potentially meritorious* dispute, a furnisher subsequently fails to report that the claim is disputed." (emphasis added)); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) ("In other words, a furnisher does not report 'incomplete or inaccurate' information within the meaning of § 1681s–2(b) simply by failing to report a meritless dispute, because reporting an actual debt without noting that it is disputed is unlikely to be materially misleading. It is the failure to report a *bona fide* dispute, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s–2(b)." (emphasis added)). Several federal district courts have likewise reasoned that "[f]urnishers have no duty to report wholly meritless, frivolous disputes." *Sherman*, 627 F. Supp. 3d at 1011 (collecting cases); *see also, e.g.*, *Van Veen v. Equifax*

*Info.*, 844 F. Supp. 2d 599, 606 (E.D. Pa. 2012). The Court finds the reasoning of these decisions persuasive and agrees that only potentially meritorious or bona fide disputes need to be reported to a CRA by a furnisher.

As such, in deciding whether a factfinder "could reasonably conclude that [a furnisher's] decision to report [a] debt without any mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect,'" *Saunders*, 526 F.3d at 150 (emphasis omitted), the Court considers whether Alston's disputes were potentially meritorious and bona fide such that they "could materially affect how one interprets [Plaintiff's] creditworthiness," *Sherman*, 627 F. Supp. at 1012. In undertaking this analysis, the Court takes guidance from *Sherman*, where a fellow district court held that "a dispute is bona fide or potentially meritorious if it is relevant to the disputed credit line provided by the furnisher, generally factually correct and sufficiently complete to provide the furnisher notice of the nature of the dispute, and suggests that a borrower is less financially irresponsible than the undisputed report tends to suggest." *Sherman*, 627 F. Supp. at 1012–13. "A dispute is also more likely to be bona fide if the reported information showing irresponsibility did not arise from the actions of the borrower." *Id.* (citing *Hrebal v. Nationstar Mortg. LLC*, 385 F. Supp. 3d 849, 852 (D. Minn. 2019)). "Additionally," the Court is mindful that "a dispute may be potentially meritorious and need to be reported even if the dispute would not succeed at a trial." *Id.* (citing *Saunders*, 526 F.3d at 150).

Applying that helpful guidance here, the Court considers whether there is record evidence from which a factfinder could reasonably infer that Alston's disputes of the BB&T and SunTrust Accounts were bona fide or potentially meritorious. With respect to the BB&T Account, Alston's claim centered on (1) the month Truist reported the delinquency and (2) the payment Alston testifies that he attempted to make in December 18, but which he admits was never processed.

20

And with respect to the SunTrust Account, Alston's disputes similarly centered on (1) the month of the reported delinquency and (2) an allegedly attempted payment, this time in the form of a $213 check Alston asserts that he sent on May 13, 2022. The Court will address each dispute in turn.

As discussed above, the first type of dispute Alston raised—the month of the reported delinquency—appears to have been based on a misunderstanding of Truist's policy with respect to reporting 30-day delinquencies—*i.e.*, that the month reported delinquent is the month the due date was missed, rather than the month in which the due date was missed by 30 days or more. Accordingly, the Court concludes that the omission of a dispute based on this argument did not create a materially misleading impression about Alston's creditworthiness. After all, the fact remained that whatever the purported month the missed payment was attributable to, Alston did, in fact, miss a payment for at least 30 days, which is the relevant fact as it relates to his creditworthiness.

With respect to the latter disputes regarding the purported attempted payments, the Court agrees it is a closer call. However, the Court recognizes the potential chaos that could result from a finding that a meritorious dispute is generated every time a debtor claims that an online payment failed, or alleges that the "check is in the mail." Starting with the attempted online payment on December 18 towards the BB&T Account, Alston has not produced, and does not point to any evidence in this record —beyond his own testimony — to create a genuine dispute of material fact about whether such an attempted payment occurred. *See* ECF 83-3, at 12–13, 175:22–180:2. The Court has real concerns about whether Alston's "own, self-serving" testimony "containing conclusory assertions and unsubstantiated speculation" can sufficiently "stave off summary judgment" alone. *Larken v. Perkins*, 22 F. App'x 114, 115 n.* (4th Cir. 2001). Regardless, even

assuming it true that Alston attempted to make an online payment on December 18, he does not point to any evidence in this record that he notified either a CRA or Truist of the attempted online payment in December or in the months following, during which he disputed Truist's reporting on the BB&T Account. Rather, Alston's disputes related to the 30-day delinquency omitted any reference to an alleged online payment attempt, and instead primarily focused on the correct account number and whether certain numbers had ceased to exist due to reports of fraud. *See, e.g.*, ECF 83-9, at 2. Alston's May 17, 2022 email to Experian's counsel, over *five months* after the alleged attempted payment, appears to be the first instance in which Alston contended that the delinquency reported in January was inaccurate with respect to a purported attempt at payment on the BB&T Account in December. ECF 83-7, at 2. Alston provides no evidence of contemporaneous communications with Truist about the purported payment processing issue. And even in the emails with Experian's counsel, Alston made no explicit mention of an attempted online payment on December 18 specifically, instead erronousely contending that he paid his bill on December 21, 2021. *See id.*; *see also supra* note 6. In his prior communication with Experian's counsel on the same email chain, he stated on January 26, 2022: "In December I paid on the 21st." *Id.* at 3. Moreover, Alston's dispute existed against the backdrop of his other late payments on the BB&T Account. *See generally* ECF 83-5. Thus, given the nature of the alleged dispute (one entirely resting on Alston's unverifiable allegation), Alston's history of delinquent non-payments, and Alston's failure to raise the issue until nearly half a year after the fact, Truist had no reason to consider Alston's dispute regarding the delinquency as bona fide or potentially meritorious one, nor was Alston's dispute actually potentially meritorious given what it is.

The Court turns next to the $213 check applied to the SunTrust Account in July of 2022 that Alston alleges was mailed to Truist in May of 2022. *See* ECF 83-19, at 1. There is more on

this record than Alston's self-serving assertion that such a check existed and was mailed. Indeed, it is undisputed that Alston paid $213 by check as reflected on the SunTrust Account transactions provided to the Court. *See* ECF 83-16, at 14. However, the issue is not whether Alston did, in fact, mail the check; rather, the question is whether Truist erred in not treating his claim that he did as potentially actionable. On this record, Alston's claim falls short for many of the same reasons his allegation of an attempted payment in December of 2021 does. First, there is a months-long delay in even raising the alleged payment. The first mention of the check in a dispute appears to be on July 5, 2022, and shortly thereafter on July 12, 2022, in letters to both Experian and Equifax, respectively. ECF 83-12, at 2 ("The Truist Bank 552393 is being inaccurately reported as 30-days late in June 2022. Enclosed is a copy of the check that was mailed to Truist Bank for the June 2022 payment. The check was mailed on May 13, 2022 and should have been credited by Truist Bank on or by June 1, 2022."); ECF 83-19, at 6. The ACDV that was generated in relation to that letter and Truist's record of investigation, ECF 91-1, at 28–37, included those "client letter[s]" and the attachment of the images of the check and postmarked envelope, *id.* at 29, 34, which Truist's records reflect that it had access to, *id.* at 32 ("Image Access Indicators: Yes"), 37. Further, as Truist points out, the photograph of the check attached to the letters includes a memo line referring to "credit card 9173," which does not appear on this record to reference a number associated with the SunTrust Account. *See* ECF 83-17, at 2. In the absence of any other information presented to Truist by Alston prior to the ACDV, in the ACDV itself, or from Truist's internal systems regarding the receipt of the check, there was no reason for Truist to treat this dispute as potentially meritorious or bona fide—especially since Alston's own evidence suggests that his error in addressing the account to which the check should be applied led to any delay in

crediting the check. Moreover, like the BB&T Account, Alston's dispute here also existed against the backdrop of his other late payments on the SunTrust Account. *See generally* ECF 83-16.

Truist invokes *Braun v. Trans Union LLC*, No. CV 19-06098-CJC(SKX), 2019 WL 13083348 (C.D. Cal. Oct. 10, 2019), to further support the conclusion that, as a matter of law, Alston's dispute regarding the $213 check was not the type of potentially meritorious or bona fide dispute which, if omitted, could lead to a materially misleading credit report. In *Braun*, the plaintiff was leasing a car and signed up for autopay for her monthly payment. *Id.* at *1. However, when plaintiff got a two-month lease extension, the autopay withdrawals from her account stopped without her realizing, and the leasing company did not receive payment. *Id.* "Her resulting 30-day late payment was reported to credit reporting agencies and caused her credit score to drop about 100 points." *Id.* The plaintiff disputed that report with the CRAs, but to no avail. *Id.* In dismissing plaintiff's resulting FCRA claim, the Court held that "Plaintiff's payment was unquestionably late; she merely disputes that the lateness was not her fault" and the omission of that information is "not sufficient to plead a 'materially misleading' statement on her credit report." *Id.* at *3 (citing *Gorman*, 584 F.3d at 1163).

Alston attempts to distinguish *Braun* by suggesting that "the plaintiff [in *Braun*] forgot to make her payment." ECF 109, at 6 (emphasis omitted). However, it is not clear to the Court why the Braun plaintiff's failure to ensure that autopay continues through the period of an extension is meaningfully distinct from Alston's failure to take any steps to ensure that a check he allegedly mailed was received and properly credited to his account.[15] Additionally, Alston cites *Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714 (E.D. Pa. 2011), to support his argument that the failure to note a dispute over the alleged mailing of the check is "misleading because a person

---

[15] The same logic applies to the alleged attempted payment in December of 2021.

reviewing [] Alston's credit report may believe that he did not try or could not make his payment." *See* ECF 96-2, at 28; ECF 109, at 7. But in *Shannon*, "[t]he undisputed facts reveal[ed] that Plaintiff sent a check for $260.10, but that Verizon *never cashed it*." 764 F. Supp. 2d at 722 (emphasis added). "Thus, the Verizon tradeline on Plaintiff's Equifax credit report may have been technically accurate, but may also have been misleading—for example, a trier of fact could find that the Verizon tradeline could leave the impression that Plaintiff never even attempted to pay his bill, even though Plaintiff had *in fact* mailed a check to cover the debt." *Id.* (emphasis added); *see also Abukhodeir v. AmeriHome Mortg. Co., LLC*, No. 8:21-CV-563-WFJ-JSS, 2021 WL 3510814, at *4 (M.D. Fla. Aug. 10, 2021) (finding at the motion to dismiss stage "that Plaintiffs have adequately pled that AmeriHome's reporting was misleading" where "Plaintiffs have alleged that they enrolled in AmeriHome's autopay program; they had sufficient funds to make their mortgage payments; they gave AmeriHome the authority to withdraw the funds from their account; and AmeriHome inexplicably failed to process their automated payments" and that "AmeriHome promised to delete any late fees they had incurred and promised to help them correct any related issues").

Unlike *Shannon*, the record here reveals that there is no agreement as to when, in fact, Truist received the check. Regardless, it is true that Truist eventually received (and deposited) the check, and it is Truist's policy to post a customer payment on the date it is *received*, regardless of when the payment is processed, not on the date on which the check was *sent*. ECF 83-4, at 12, 81:11–82:4; ECF 83-16, at 14; ECF 91-1, at 30. Alston counters that "[i]n Maryland, if a plaintiff can prove that he properly mailed the check, then there is a presumption that the check was received in a timely manner." ECF 96-2, at 24 (citing *Brantley v. Nationwide Mut. Ins. Co.*, 2008 WL 2900953 (D. Md. Jul. 22, 2008)); *see also* ECF 109, at 3–4 (citing *Casto v. Branch Banking*

& *Tr. Co.*, No. CV 3:16-5848, 2018 WL 265586, at *5–6 (S.D. W. Va. Jan. 2, 2018) ("These two concrete facts, the postmarked date and the correctly addressed envelope, give rise to a rebuttable presumption of timely delivery. Under the traditional common law mailbox rule, a correctly addressed letter placed into the mailing system is presumed to arrive at its delivery point in the usual time.")). That argument misses the mark. If all Alston had to generate was a genuine dispute of material fact as to whether he mailed the check in May of 2022, then perhaps he would succeed in making such a showing here. Again, the issue is not whether Alston did, in fact, mail the check in May of 2022, but rather whether Truist was, under the facts presented here, obligated to treat his claim alleging that he did as a bona fide and potentially meritorious dispute. Stated differently, the Court is tasked with determing whether a reasonable fact finder could conclude that Alston's dispute was potentially meritorious or bona fide in light of the information available to the furnisher when it received the dispute such that the omission of the disputed status from future reporting could be materially misleading with respect to Alston's creditworthiness. For the reasons explained, the Court concludes that no reasonable fact finder could reach that conclusion here.[16]

With only ACDVs from CRAs reflecting Alston's dispute as to the May 13, 2022 check initiated well after it was purportedly mailed, and in light of Alston's prior late payment history

---

[16] The parties also address the reasonableness of Truist's investigation into Alston's many alleged disputes. *See* ECF 96-2, at 21; ECF 108, at 18. "Generally, whether a furnisher conducted a reasonable investigation is a question of fact for the jury." *Davenport v. Sallie Mae, Inc.*, 124 F. Supp. 3d 574 (D. Md. 2015) (citing *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 510 (D. Md. 2004)), *aff'd*, 623 F. App'x 94 (4th Cir. 2015). The Court has serious doubts as to whether a dispute of material fact exists as to the reasonableness of Truist's investigations into Alston's alleged disputes, particularly against the backdrop of Alston's prolific litigation and the nature of his allegations here which were, after all, virtually unverifiable and solely hinging on Alston's credibility. However, because the Court concludes that Truist did not report any inaccurate or incomplete information upon which Alston can found his FCRA claims, it need not, and therefore does not, address the reasonableness of Truist's investigation here.

on the account, the Court concludes that Alston's SunTrust Account dispute with respect to the allegedly mailed check was not bona fide as a matter of law. Accordingly, the failure to note the dispute was not "materially misleading." *Sherman*, 627 F. Supp. 3d at 1004. And because the Court reaches the same conclusion with respect to Alston's dispute of the BB&T Account delinquency, it need not wade further into Alston's cross-motion for summary judgment. Alston's FCRA claims ultimately fail because no reasonable fact finder could conclude that Truist reported inaccurate or incomplete information related to either of Alston's accounts.

### 2. Evidence of Damages

In light of the above conclusion, the Court need not consider the issue of damages. However, Alston's failure to establish an issue of material fact as to recoverable damages also merits summary judgment in Defendant's favor. "It is not enough . . . to show that a defendant violated § 1681 s–2(b) to survive summary judgment. A failure to establish damages would still warrant summary judgment in favor of a defendant." *Davenport v. Sallie Mae, Inc.*, 124 F. Supp. 3d 574, 581 (D. Md. 2015), *aff'd*, 623 F. App'x 94 (4th Cir. 2015). If a violation of the FCRA is caused by a party's negligence, a plaintiff may get "any actual damages sustained by the consumer as a result of the failure," along with "the costs of the action together with reasonable attorney's fees." 15 U.S.C. § 1681*o*(a).

However, "[w]ithout a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.'" *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) (first citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996); then citing *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir.1995); and then citing *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160–61 (11th Cir.1991)). "As with most tort actions, a FCRA plaintiff must produce sufficient evidence from which a reasonable trier of fact could infer that the inaccurate entry was a 'substantial factor'

that brought about the denial of credit." *Enwonwu v. Trans Union, LLC*, 364 F. Supp. 2d 1361 (N.D. Ga. 2005), *aff'd*, 164 F. App'x 914 (11th Cir. 2006); *see also Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235 (4th Cir. 2009) (observing that the "evidence presented at trial clearly demonstrate[d]" causation with respect to damages in part because "two loan officers testified that the inaccurate Equifax credit reports were a *substantial factor* in their inability to approve Robinson for a loan, and that they could not qualify her for a loan unless and until the erroneous accounts either were paid off or removed from her credit report" (emphasis added)). Further, if a violation of the Act is willful, a plaintiff may receive actual damages "not less than $100 and not more than $1,000" or punitive damages, along with "the costs of the action together with reasonable attorney's fees." *Id.* § 1681n(a).

i.    *Actual Damages*

To assert a money damages claim under the FCRA, a plaintiff must show a denial of credit due to inaccurate or incomplete credit reporting. "'Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.'" *Crabill*, 259 F.3d at 664 (citing *Philbin*, 101 F.3d at 963). Alston asserts that he was denied credit seven times between May 2021 and May 2023. ECF 83-6, at 5. Alston also provides exhibits reflecting the denial of loans for various reasons, including: a "delinquency history on bureau report" on April 29, 2022, ECF 83-27, at 2; that "[t]he time since delinquency is too recent or unknown" on May 13, 2022, ECF 83-28, at 2; and "[n]umber of accounts with delinquency" on June 7, 2022, ECF 83-30, at 4.[17] Further Plaintiff contends that he "would have

---

[17] Two of the denial letters in the record do not reference any delinquency at all and thus do not bear on the issue of whether the alleged reporting inaccuracies by Truist actualy caused Alston's alleged damages. *See* ECF 83-26, at 2; ECF 83-29, at 2; ECF 83-30, at 3 (displaying no result on loan application at all but confirming the submission of an application).

been approved for credit" if the BB&T and SunTrust Accounts were not on his reports. ECF 83-6, at 5. Truist argues that Alston cannot show a substantial causal relationship between Truist's alleged violation and Alston's alleged credit denials because "Alston had other 'blemishes' on his credit report that affected his ability to obtain credit." ECF 83-1, at 22–23 (first citing *Lee v. Experian Info. Servs.*, 2003 WL 22287351, at *5 (N.D. Ill. Oct. 2, 2003); and then citing *Enwonwu*, 364 F. Supp. 2d at 1366). Those additional "blemishes" are exhibited in the letters of denial for various loans for which Alston applied and, in fact, none of the denial notices present in this record reflect a decision based solely on the basis of Alston's reported 30-day delinquencies. *See, e.g.*, ECF 83-28, at 4 (also denying loan because Alston had "[t]oo many recently opened unsecured trade lines" and had "[e]xcessive unsecured loans," and also because the "[d]ate of [Alston's] last [credit] inquiry [was] too recent"). Neither can the Court ignore Alston's extensive history interacting with entities in the loan and credit world in considering his burden with respect to damages, causation, and loan denials.

With respect to causation as it relates to the Suntrust Account, however, the Court observes a more fundamental problem: the June 7, 2022 denial letter from SoFi, *see* ECF 83-30, at 4, appears to be the only exhibit in the record related to actual or monetary damages that could support Alston's FCRA claim related to reporting on the SunTrust Account. Yet, the date on which that letter reports accessing Alston's credit score is "04/18/2022," which was *before* the alleged delinquency on the SunTrust Account in June 2022 and thus well before Truist's allegedly inaccurate reporting on that delinquency. Alston does not point to any other evidence to support actual damages arising from the alleged violation related to the SunTrust Account. *See* ECF 96-2, at 32; ECF 109, at 15.

ii.    *Emotional Damages*

Alston also claims that he suffered mental anguish and emotional distress due to Truist's credit reporting. ECF 34, at 7 ¶ 65. The Fourth Circuit has held that a plaintiff's testimony, even standing alone, may support an award of compensatory damages for emotional distress. *Price v. City of Charlotte*, 93 F.3d 1241, 1251–52 (4th Cir. 1996). However, such testimonial evidence "must be demonstrable, genuine, and adequately explained." *Id.* at 1252. "A plaintiff's own conclusory allegations that he felt 'embarrassed,' 'degraded,' or 'devastated,' and suffered a loss of self-esteem, will not suffice to create a disputed issue of material fact for the jury regarding the presence of compensable emotional distress." *Doe v. Chao*, 306 F.3d 170, 180 (4th Cir. 2002) (citing *Price*, 93 F.3d at 1255), *aff'd*, 540 U.S. 614 (2004). Put another way, a plaintiff's testimony must "indicate how their alleged distress manifested itself." *Price*, 93 F.3d at 1255. Where, for example, "a plaintiff can produce evidence that emotional distress caused chest pains and heart palpitations, leading to medical and psychological treatment which included a formal diagnosis of 'major depressive disorder,' as well as necessitated prescription medication, it is clear that some amount of compensatory damages for emotional distress is warranted." *Doe*, 306 F.3d at 180 (citing *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001)). Plaintiff also "must demonstrate a causal connection between the [] violation and [his] demonstrable emotional distress to recover compensatory damages." *Price*, 93 F.3d at 1951 (citing *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir. 1977)).

Truist argues that, "[h]aving never sought treatment from any mental health professionals (Ex. 1, Alston Depo. at 243:9-19), Alston's alleged emotional damages boil down to generalized and non-specific claims of stress (*id.* at 245:12-246:15), anger (*id.* at 259:9-22) and frustration (*id.* at 268:21-269:8)." ECF 83-1, at 25. In response, Alston primarily points to the declaration he

submitted in support of his cross-motion and opposition.[18] ECF 96-2, at 13 n.16 ("Plaintiff has provided detailed testimony about the distress endured trying to correct his report. (Alston Decl. ¶¶ 65-81)."); ECF 109, at 15. But there, too, Alston's assertions related to emotional distress are vague and fail to articulate with the required specificity how his distress flowed from the violations alleged here and how it "manifested itself" in his life. *Price*, 93 F.3d at 1255. Accordingly, the Alston's assertions of emotional distress are not sufficient to support his FCRA claim.

### iii. *"Willful" Violation and Punitive Damages*

"[A] willful violation of the FCRA triggers statutory and punitive damages in addition to actual damages." *Brown v. Credit One Bank, N.A.*, Civ. No. 23-CV-2512-PX, 2024 WL 3993194, at *4 (D. Md. Aug. 28, 2024). Alston is entitled to prevail under § 1681n of the FCRA pursuant to a violation of § 1681s-2(b) and to recover punitive damages only if he can show that Truist "willfully" violated the statute. *See* 15 U.S.C. § 1681n(a)(2). In assessing willfulness under the FCRA, the Fourth Circuit has before noted that "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind," although it is not unheard of. *Dalton*, 257 F.3d at 418 (quoting *Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984)); *see also Sherman*, 627 F. Supp. 3d at 1019 n.21.

"A showing of malice or evil motive is not required to prove willfulness under the Act." *Dalton*, 257 F.3d at 418. Rather, the plaintiff must show either that the defendant 'knowingly and intentionally committed an act in conscious disregard for the rights' of the consumer," *id.* (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986)), or that it acted in "reckless disregard" of

---

[18] A party asserting that a fact cannot be or is genuinely disputed can support that assertion by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B), (2). To the extent that Truist challenges Court's ability to rely on the Alston declaration at the summary judgment stage because it is "rife with inadmissible hearsay," the Court disagrees because the portion of the declaration related to emotional distress does not rest on hearsay.

the FCRA, *Safeco*, 551 U.S. at 69. *See also Saunders*, 526 F.3d at 151 & n.4 ("The Supreme Court

has since held that willful violations of FCRA include violations committed in reckless disregard

of a company's obligations under FCRA." (citing *Safeco*, 551 U.S. at 57–60)). "[A] company

subject to FCRA does not act in reckless disregard of it unless the action is not only a violation

under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating

the law substantially greater than the risk associated with a reading that was merely careless."

*Safeco*, 551 U.S. at 69. "To assess whether a reading is objectively reasonable, courts consider

whether the reading 'has a foundation in the statutory text' or whether parties have the 'benefit of

guidance from the courts of appeals' or federal regulatory agencies." *Sherman*, 627 F. Supp. 3d

at 1018 (quoting *Safeco*, 551 U.S. at 69–70).

As primary support for its contention that Truist acted willfully,[19] Alston argues that

maintaining a blanket policy of never reporting an account as in a disputed status can support a

finding of willfulness. ECF 109 at 2, 3, 13. To support that proposition, Alston cites *Seamans v.*

*Temple University*, in which the Third Circuit held that "[a] furnisher's objectively unreasonable

actions with respect to a particular consumer's account can support a jury finding of willfulness.

Blanket policies, too, can underpin such a finding." 744 F.3d at 868. Truist's corporate designee

testified that "CRRG advises us not to [report the account as in dispute] for ACDV disputes," and

that "[o]nce an investigation is concluded, we no longer consider that case in dispute," ECF 83-4,

at 8, 53:21–54:19. He followed up by stating, in response to a question about whether Truist would

put in the "comments" whether an account was still in dispute, "[t]hat's not normal policy. If a

client were to request it, then perhaps that might take place." *Id.* at 8, 54:20–55:7. Alston does

---

[19] While Alston does not make any arguments in his cross-motion and opposition that Truist acted willfully, he does seem to make arguments to that effect in his reply. *See* ECF 109.

not point to any other evidence in the record supporting the existence of a "blanket" policy of the type at issue in *Seamans* exists here, beyond the fact that his own disputes were not reported. And contrary to any assertion about an across-the-board policy, the designee's testimony reflects that Truist considers a case in dispute for the pendency of the investigation of an ACDV, during which time the CRA is already aware of the issue, and further stated that Truist may reflect a particular issue as disputed upon a customer's request. Certainly, with respect to Truist's decision to refrain from reporting Alston's purported dispute here, that choice appears to be in-line with an "objectively reasonable" reading of Truist's obligations under the FCRA and in accord with case law exploring the obligation to report bona fide or potentially meritorious disputes, as discussed *supra* Section III.A.1.ii. Thus, the Court concludes that the record does not reflect a dispute of material fact as to Truist's willfulness, and Alston thus cannot assert statutory damages. Summary judgment is thus warranted in Defendant's favor as to all of Alston's alleged damages.

### B.    Count Two: Defamation

Plaintiff brings a common law defamation claim based on the reporting of the same allegedly derogatory information that underlies Plaintiff's FCRA claim. *See* ECF 34. "Under Maryland law, to present a prima facie case of defamation, a plaintiff must establish four elements: (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." *Offen v. Brenner*, 935 A.2d 719, 723–24 (Md. 2007) (citing *Smith v. Danielczyk*, 928 A.2d 795, 805 (2007)). Defendant argues that the defamation claim "fails as a matter of law because (a) the information Truist reported to the credit reporting agencies was factually accurate and (b) the claim is preempted pursuant to 15 U.S.C. § 1681h(e)" because "there is no evidence that Truist acted with reckless disregard of the FCRA's requirements." ECF 83, at 1; ECF 83-1, at 5–6.

Alston does not respond to Truist's arguments or advance any affirmative arguments of his own with respect to the defamation claim. Indeed, Alston does not even mention the defamation claim in his proposed order, which simply asks that the motion "should be in all things granted," ECF 96-1, at 1, nor does the conclusion of his memorandum in support of his motion ask for anything more than a "[j]udgment that Defendant[] violated the FCRA" and relief arising under that statute, in addition to "other and further relief as the Court may deem just and proper." ECF 96-2, at 32–33. Truist argues that "[b]y failing to address or even mention Truist's arguments, Alston concedes that Truist is entitled to summary judgment on each of these claims." ECF 108, at 4. The Court agrees.

Alston's complete failure to respond to Truist's arguments regarding defamation should be treated as a concession that summary judgment is warranted in Defendant's favor on this claim. *See, e.g.*, *United Supreme Council v. United Supreme Council of Ancient Accepted Scot. Rite for 33 Degree of Freemasonry*, 329 F. Supp. 3d 283, 292 (E.D. Va. 2018) ("Failure to respond to an argument made in a dispositive pleading results in a concession of that claim."); *Coomes v. Moran*, Civ. No. ELH-22-02639, 2025 WL 2106739, at *39 (D. Md. July 28, 2025) ("I need not spill ink to consider contentions that are waived."); *Brand v. N.C. Dep't of Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) (collecting cases and noting that the plaintiff's failure to "address [the d]efendants'[] motion for summary judgment concerning his hostile work environment claim . . . concedes that [plaintiff] has not stated a hostile work environment claim."); *Ostergren v. Vill. of Oak Lawn*, 125 F. Supp. 2d 312, 323 (N.D. Ill. 2000) ("In their Motion for Summary Judgment and Response to Defendants' Motion for Summary Judgment, Plaintiffs utterly fail to provide any analysis or authority to support their takings clause claims. . . . [T]he

Court concludes that the Plaintiffs have effectively waived this claim by failing to properly address it in response to Defendants' Motion for Summary Judgment.").

### C.   Count Three: TILA

"Congress passed TILA 'to assure a meaningful disclosure of credit terms' by 'mandat[ing] that creditors make specific disclosures before extending credit to consumers.'" *Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 590 (D. Md. 2013) (alteration in original) (quoting *Jones v. Koons Automotive, Inc.*, 752 F. Supp. 2d 670, 682 (D. Md. 2010)). Alston alleges that Truist violated 15 U.S.C. § 1666c, *see* ECF 34, at 8 ¶ 79, a part of TILA known as the Fair Credit Billing Act ("FCBA"). *See Lawrence v. Household Bank (SB), N.A.*, 343 F. Supp. 2d 1101, 1104, 1106 (M.D. Ala. 2004). "The FCBA was enacted to protect consumers against unfair and inaccurate credit billing practices by mandating billing dispute procedures for creditors to follow." *Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 592 (E.D. Va. 2014). Section 1666c provides:

> Payments received from an obligor under an open end consumer credit plan by the creditor shall be posted promptly to the obligor's account as specified in regulations of the Bureau. Such regulations shall prevent a finance charge from being imposed on any obligor if the creditor has received the obligor's payment in readily identifiable form, by 5:00 p.m. on the date on which such payment is due, in the amount, manner, and location indicated by the creditor to avoid the imposition thereof.

15 U.S.C. § 1666c(a). In other words, the FCBA "requires creditors to timely accept credit payments made by consumers." *Brown v. Credit One Bank*, No. CV 23-23008 (RMB-MJS), 2024 WL 4553683, at *1 n.1 (D.N.J. Oct. 21, 2024). An implementing regulation further provides that "[a] creditor shall credit a payment to the consumer's account as of the date of receipt." 12 C.F.R. § 226.10(a).

Defendant argues that Plaintiff's TILA claim "fails as a matter of law because there is no evidence that Truist failed to promptly post Alston's payments upon receipt." ECF 83, at 1.

Although Plaintiff apparently "took a photograph of a postmarked envelope that supposedly contained his payment," Defendant contends that "Alston admits that he does not know and cannot show when Truist actually received this payment—much less, that Truist received the payment any time prior to its posting on July 8, 2022." ECF 83-1, at 6; *see also id.* at 28–30.

The Court need not wade into the merits of Truist's arguments regarding Alston's § 1666c claim as Alston has failed to respond to this argument. As with the claim related to defamation, "[i]n failing to respond to this argument[,] Plaintiff concedes the point." *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016). Further, Federal Rule of Civil Procedure 56(e) holds that "[i]f a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed . . . [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e). Since Alston fails to respond to Truist's assertions of fact that weaken his TILA/FCBA claim, and has otherwise completely failed to respond to the arguments in support of summary judgment as to this count, the Court concludes that Alston has conceded the motion for summary judgment with respect to his TILA/FCBA claim.

### D.    Attorney's Fees

In addition to summary judgment on Alston's FCRA claim, Truist also moves for an award of reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681o(b) and 1681n(c) on the ground that "the claim was brought in bad faith and without foundation." ECF 83, at 2; ECF 83-1, at 6, 30. Sections 1681o(b) and 1681n(c) of the FCRA provide that, upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section "was filed in bad faith or for purposes of harassment," the court shall award to the prevailing party reasonable attorney's fees. 15 U.S.C. §§ 1681o(b), 1681n(c). "The statute requires a showing that a document was *filed* in bad faith." *Rogers v. Johnson-Norman*, 514 F. Supp. 2d 50, 52 (D.D.C.

2007) (quoting *Ryan v. Trans Union Corp.*, No. 99–216, 2001 WL 185182, at *6 (N.D. Ill. Feb.26, 2001)) (emphasis in *Ryan*).  "It is not enough to show that the 'pleading, motion, or other paper' in question 'later turned out to be baseless.'" *Id.* (quoting *Ryan*, 2001 WL 185182, at *6).

The Court declines to grant Truist's request under §§ 1681*o*(b) or 1681n(c).  In support of its request for attorney's fees, Truist argues that "this Court must consider the obvious that Alston is a litigant seeking to create and profit from the filing of claims." ECF 83-1, at 30.  Truist points to the "facts and circumstances of this case"—presumably referring to the numerous FCRA cases Alston and his family, friends, and associates have filed since 2011, *id.* at 4 n.1—and "the lack of evidence supporting Alston's FCRA claim" to suggest that Alston's "FCRA claim was asserted simply as an attempt to extort a settlement," *id.* at 30.

As the Court previously observed, Alston is a frequent filer of FCRA claims in this Court. However, that fact alone does not compel the Court to conclude that this action was filed in bad faith or for purposes of harassment.  Moreover, filing a lawsuit with the hope of securing a settlement early in the litigation is not necessarily harassment; it is, in fact, common, if not routine. And although Truist appears to insinuate that Alston has fabricated evidence related to his disputes, *see* ECF 83-1, at 6, Truist points to no direct evidence of bad faith.[20]  Accordingly, the Court declines to find that Alston is liable for Truist's attorney's fees pursuant to 15 U.S.C. §§ 1681*o*(b) or 1681n(c).

---

[20] In reply, Truist observes that "noticeably absent from the Cross-Motion and the Alston Declaration is any suggestion that Truist reported the BB&T Account 60-days delinquent." ECF 108, at 8 n.3.  Truist argues that such absence "not only calls into question the veracity of Alston's dispute letters to the CRAs, but also substantiates Truist's concern that this claim was filed in bad faith and without foundation." *Id.*  While the Court acknowledges Truist's concern, it also notes that a plaintiff may cease to pursue an argument for a variety of reasons.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant Truist Bank's motion for summary judgment, ECF 83, is granted, except that the Court denies Defendant's request for attorney's fees under the FCRA, and Plaintiff Thomas J. Alston's amended cross-motion for summary judgment, ECF 96-2, is denied.  The case is closed.

A separate implementing Order will issue.


Dated: <u>September 30, 2025</u>                                     <u>          /s/          </u>
                                                                    Brendan A. Hurson
                                                                    United States District Judge